UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| **KSTP-TV, LLC and KSTC-TV, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No. 3:20-CV-267 |
| | ) | |
| **ELECTRONICS RESEARCH, INC.** | ) | Jury Trial Demand |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.  Plaintiffs KSTP-TV, LLC and KSTC-TV, LLC (collectively referred to herein as "Hubbard") are subsidiaries of Hubbard Broadcasting, Inc., a Saint Paul, Minnesota-based, family-owned, and family-operated broadcasting and media company with operations dating back to 1923. Hubbard began television broadcasts in 1948. For decades, Hubbard has broadcast television signals from two towers located as part of the "Telefarm" tower and antenna site located in Shoreview, Minnesota. With respect to the tower known as the "North Tower," Hubbard utilized a Harris Deltastar stacked array antenna system without any problems with either the North Tower or its antennas. In part due to federal regulations, which required changing broadcast channels, Hubbard had to replace the stacked array. It chose, contracted with, and paid substantial sums to Defendant Electronics Research, Inc. ("ERI") to design, manufacture, and install its antenna system on the North Tower in August 2019. Seven months after the installation by ERI of its antennas, ERI had to remove the antennas from the North Tower because they were badly damaged, having been unable to hold up to normal wind conditions. ERI, rather than admitting that the obvious defects in its antennas were the cause of the damage, claimed that the guy wires

connected to the Tower had "galloped," causing the damage. ERI based its claim of galloping on a conversation with a Hubbard technician. In fact, however, that technician told ERI that in his thirty years at the North Tower site, he had never seen galloping of the North Tower guy wires. This made no difference to ERI, and it subsequently issued a report falsely claiming an admission of galloping by the Hubbard technician.

2. In fact, the cause of the damage was the defective design of the antennas. Simply put, the defective ERI antennas were unable to resist even low wind speeds without vibrating violently, which caused them to sustain significant damage while they literally and improperly flapped in the wind. ERI's defective design was a breach of the contracts between it and Hubbard, and specifically breached the warranties therein that promised Hubbard that the ERI antennas would be free of defects in material and workmanship and meet a certain design standard. Because of these defects in the antennas supplied by ERI which caused them to fail, Hubbard has suffered substantial injury. To make matters worse, ERI has steadfastly refused to redesign or replace the defective antennas it supplied to Hubbard, despite its contractual obligation to do so.

3. Finally, ERI has gone further, and has now effectively claimed unauthorized possession over Hubbard's antennas. Having taken possession of them, ERI has intentionally refused to return them by unilaterally imposing new demands separate and apart from the contract: if Hubbard wants its property back free from defects, it must undertake an expensive and gratuitous "analysis" of the North Tower performed by ERI, and make changes to the North Tower deemed necessary by ERI. ERI's demands would substantially increase, without justification, the cost to Hubbard of regaining possession of its antennas. As result of ERI's conduct, Hubbard has no choice but to pursue its remedies in this action.

## PARTIES

4. Plaintiffs KSTP-TV, LLC and KSTC-TV, LLC are each Delaware limited liability companies with their principal place of business located at 3415 University Avenue, St. Paul, MN 55114.

5. Defendant Electronics Research, Inc. ("ERI") is an Indiana corporation with its principal place of business located at 777 Gardner Road, Chandler, IN 47610. ERI designs, fabricates, assembles, and provides broadcast antennas and other related products and services.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendant ERI because ERI is located in, transacts business in, and has engaged in certain activities giving rise to this action in the Southern District of Indiana.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) as Defendant ERI resides in this district, a substantial part of the events or omissions giving rise to Hubbard's claims occurred in this district, certain property that is the subject of this action is situated in this district, and the contract between the parties specifies that contract disputes between the parties brought in federal court must be resolved in this district.

## FACTS

### ERI's Proposals to Install Its Antenna System on the North Tower

9. Beginning on July 20, 2018, ERI presented to Hubbard the first of three Proposals describing an antenna system for broadcasting television signals to be mounted on the North Tower

in Shoreview, Minnesota. The previous Harris Deltastar stacked array antenna system had to be replaced because of certain federal regulatory requirements. The Harris Deltastar stacked antenna system had been on the North Tower for twenty years without incident.

10. The July 20, 2018 Proposal identified the following antenna for Hubbard's KSTP-TV Channel: a Top Mounted Elliptically Polarized UHF TRASAR Television Transmitting Antenna (Product No. ATW26H53-ETO-35H) at a price of $218,711.63. Hubbard accepted the ERI Proposal.

11. ERI submitted a second Proposal to Hubbard on July 24, 2018 for Hubbard's KSTC-TV Channel, which included a Top Mounted Elliptically Polarized UHF TRASAR Television Transmitting Antenna (Product No. ATW26H53-ETO-30H.); a Wedding Cake Support Pedestal; a Custom Tower Section; and one solid steel, hot-dip galvanized 9' face tower spine section for a total price of $443,104.27. Hubbard accepted the ERI Proposal.

12. ERI submitted a third Proposal to Hubbard on November 26, 2018 to install the ERI antenna system for a price of $882,037. Hubbard accepted the ERI Proposal.

13. The KSTC-TV Proposal of July 24, 2018 identified the industry standard that would govern the design of the ERI antenna system in its "Engineering Notes":

> "Tower spine section is designed to meet the default specifications of **ANSI/TIA-222-G Standard**. . . . As an equipment Manufacturer, ERI is not responsible for determining design criteria or other site specific or operational parameters which may affect the structure beyond those specified by the purchaser, or criteria beyond the default conditions detailed in the **ANSI/TIA-222-G Standard**. . . .
>
> It is the purchaser's responsibility to notify ERI of any stipulations in addition to the **ANSI/TIA-222-G Standard** which may be required by state or local authorities prior to the start of the contracted services." Proposal at 3. (emphasis added).

Hubbard did not provide ERI with any stipulations in addition to **ANSI/TIA-222-G**, and relied on ERI's representations in the Proposals.

4

14. The July 24, 2018 Proposal also stated that "ERI's structural fabrication processes and procedures meet the requirements set forth by the 2006 International Building Code…." Proposal at 3. Hubbard also relied on this ERI representation.

15. Section 1.2 of ERI's standard Terms and Conditions in each of the three Proposals to Hubbard states that "the Proposal contains the complete and final agreement of Buyer and ERI with respect to the Products and/or Services described therein . . . no change or addition to the Proposal shall be valid and enforceable unless made in writing and signed by an authorized representative of ERI." Hubbard agreed to each of the three ERI Proposals and relied on ERI's representations. Hubbard never sought a change or addition to any of the three Proposals, which constitute the entire agreement between Hubbard and ERI.

16. Accordingly, the governing antenna design standard in the agreements between ERI and Hubbard is **ANSI/TIA-222-G**.

17. Section 2.8 of ERI's standard Terms and Conditions contained in the Proposals states that: "Electronics Research Inc. (ERI) warrants to the original buyer [Hubbard] that its Product is free from defects in material or workmanship." As described herein, ERI breached its warranty.

18. Section 2.8.10 of ERI's standard Terms and Conditions contained in the Proposals states that ERI shall be responsible for "the replacement of defective Products or components….," and is responsible for the removal costs incurred by ERI in removing a defective Product.

**The ERI Antenna System Failed Within Seven Months of Installation**

19. The ERI antenna system consisted of three main elements: a bottom antenna; an adapter; and the top antenna. In addition, there was a top-mounted beacon on the antenna. The bottom antenna was a television Channel 30 antenna for over-the-air broadcasting of KSTC

5

programming. The ERI antenna had a 28.5 inch radome and an interior support pole consisting of a pipe of 20 inches in diameter x 1.031 inches in thickness. It was 54.84 feet in length. The adapter that connected the bottom antenna to the upper antenna is known in the industry as a "wedding cake." It was mounted to the top of the bottom antenna and bolted to the top antenna. The adapter ran transmission lines and a power line inside the bottom antenna that were then fed into the top antenna. The top antenna was a television Channel 35 antenna for over-the-air broadcasting of KSTP programming. It was 50.07 feet in length with an 18.4 inch radome, and an internal support pole consisting of a pipe of 10.75 inches in diameter x 0.844 inches in thickness.

20. Hubbard paid the contract price for the ERI antenna system and installation pursuant to the three ERI Proposals. On August 19, 2019, ERI installed the ERI antenna system on the North Tower.

21. In little more than a month later, on September 27, 2019, Ed Smith, Hubbard's Director of Engineering reported to ERI that the KSTP antenna was out of plumb, indicating movement of the antenna. On October 7, 2019, ERI replumbed the antenna.

22. In March 2020, Hubbard personnel noticed pressure leaks on the KSTC antenna, and attempted to correct the problem without success. On April 10, 2020, Hubbard reported the pressure leaks to ERI. On April 17, 2020, an inspection by National Tower Controls, LLC identified leaks coming from cracks in the welds of the baseplate of the KSTC Channel 30 antenna.

23. On April 22, 2020, ERI arrived on the North Tower site, and removed the ERI antenna system from the North Tower by helicopter, shipping the antenna system to the ERI facility in Chandler, Indiana for repair or replacement. ERI has improperly sought payment from Hubbard for removal expenses of the defective antenna system. The antenna system, which Hubbard paid for in full, remains at the ERI facility in Chandler, Indiana.

### ERI's Report of April 28, 2020

24.     On April 28, 2020, ERI issued a report alleging that the cause of damage to its antenna system was "galloping" guy wires on the North Tower. Galloping is extreme movement in the guy wires, a rare phenomenon which can occur in very high winds. ERI found no evidence of galloping, and was told by experienced Hubbard on-site technicians that they had never seen galloping in the guy wires on the North Tower. Nevertheless, James Ruedlinger, an ERI engineer and the author of the ERI report, falsely claimed in that report that a Hubbard technician had told him of galloping. In fact, that Hubbard technician told ERI in a series of emails that he had made no such statement, and had never seen galloping at the North Tower in his decades of working at the site. Despite the denial by the Hubbard technician, ERI refused to remove its false statement from its report. Thus, the ERI report is based on an intentional misrepresentation.

### Hubbard Conducted Its Own Investigation of the Cause of the Damage to the Antennas

25.     In order to obtain an independent analysis, Hubbard retained the services of Madison Batt, PE, SE, the President of Tower Engineering Company, which provides Structural and Civil Engineering Services for the design of communication towers, including antenna design analysis. Mr. Batt has decades of specialization in forensic dynamic structural engineering of communication towers and antennas, and has served on the industry committee that authored **ANSI/TIA-222-G**. Hubbard instructed Mr. Batt to conduct an investigation into the cause of the damage to the ERI antenna system.

26.     Mr. Batt reviewed the ERI Proposals and certain ERI engineering documents. He visited the North Tower site and viewed the ERI antenna system at the ERI facility in Chandler, Indiana. He also conducted interviews with Hubbard's technicians, and Hubbard's Director of Engineering, Ed Smith.

**Hubbard's Investigation Revealed Two Design Flaws**

27. Mr. Batt found two principal design flaws in the ERI antenna system. The first was a failure to design the antennas to protect against vortex shedding, a failure that caused dangerous and ultimately damaging movement in the antennas during a variety of wind turbulences. Vortex shedding is a well-known concept in fluid dynamics, as well as in the industry that designs antennas that are mounted on communication towers. Vortex shedding is an oscillating flow past a bluff (as opposed to streamlined) body such as an antenna at certain velocities. In this flow, vortices are created. If the antenna is not mounted rigidly and the frequency of the vortex shedding matches the resonance frequency of the antenna, then the antenna will begin to resonate, vibrating violently with oscillations driven by the energy of the flow. This can cause severe damage, and did, in fact, cause severe damage to the ERI antenna system.

28. The ERI antenna system design did not take into account vortex shedding, and thus the antennas oscillated significantly in various wind conditions that occurred on a regular basis at the North Tower site. As a result, this violent movement caused severe damage to the antennas.

29. For decades, vortex shedding was a well-known problem in the antenna design industry. Experts in the field, including Madison Batt, came together to prescribe standards to address vortex shedding prevention and other issues through the Technology and Standards Department of the Telecommunications Industry Association (TIA). The result was ANSI/TIA-222-G known as The Structural Standard for Antenna Supporting Structures and Antennas (hereinafter referred to Standard G). Standard G was approved on August 2, 2005, reaffirmed on December 20, 2012, and reaffirmed again on August 16, 2016.

30. The introduction to Standard G states that "TIA Engineering Standards and Publications are designed to serve the public interest through eliminating misunderstandings

between manufacturers and purchasers…and assisting the purchaser in selecting and obtaining with minimum delay the proper product for their particular need."

31.     Standard G defines its Scope, in part, as "provid[ing] the requirements for the structural design and fabrication of new and the modification of existing structural antennas…."

32.     Annex A of the G Standard prescribes wind loads and pressure requirements that must be met in antenna design to prevent phenomena such as vortex shedding. Specifically, for locations not included in Annex B, "the minimum basic wind speed considered for normal loads shall be 75 mph, 3 sec gusts…." Annex B of Standard G gives specific minimum and maximum wind speeds for Ramsey County, Minnesota where the North Tower site is located. They are a minimum of 90 mph, and a maximum of 90 mph. Hubbard has evidence that the ERI antennas experienced significant movement and vortex shedding at wind speeds far below the 90 mph requirement, and has provided that evidence to ERI.

33.     The second design flaw in the ERI antenna system was an under design of the antenna poles that lacked the necessary thickness and diameter to prevent deformation and dangerous movement in the antenna system that caused significant damage to those antennas. Further, the under design was not consistent with Standard G and other standards for antenna supporting systems.

### ERI Has Refused to Return the Antenna System to Hubbard in an Operable Condition, and Has Imposed New Demands Separate and Apart from the Contract for the Return of the Antennas

34.     Hubbard has requested that ERI redesign and install an antenna system that is free from defects in material and workmanship, meets the requirements of Standard G, and is fit for the purpose of transmitting television signals without operational issues. ERI has rejected Hubbard's request, has maintained control and possession over the antenna system, and has intentionally

refused to return to Hubbard a properly re-designed, non-defective antenna system. ERI insists on falsely claiming that "galloping" caused the damage to the antenna system.

35. ERI has gone further. Having knowingly and intentionally taken possession of Hubbard's antennas, ERI has interfered with and exerted unauthorized control over them, by intentionally making a new set of demands, separate and apart from the contract, for returning Hubbard's antennas in an operable condition.

36. Specifically, ERI has demanded that Hubbard pay for an expensive and gratuitous "analysis" of the North Tower, and make changes ERI deems necessary to the North Tower that has stood for decades without problems. ERI's demands will exponentially increase, without justification, the cost to Hubbard of regaining its property in an operable condition. ERI has refused to take any further action with respect to Hubbard's antennas until Hubbard agrees to its demands.

37. As a direct result of ERI's dispossession of Hubbard's antennas, ERI has caused harm to Hubbard, which has lost the value of the use of the antenna system.

## COUNT I

## BREACH OF WARRANTY

38. Hubbard incorporates by reference paragraphs 1 through 37 of this Complaint and further alleges as follows.

39. The Proposals described herein from ERI to Hubbard, which Hubbard accepted, are valid and binding contracts.

40. ERI provided in its Proposals with Hubbard a warranty that its antennas were "free from defects in materials and workmanship."

41. In the Proposals, ERI also promised Hubbard that ERI would repair or replace without charge any defective warranted components of an ERI product if the defects were as reported and not the result of ERI exclusions.

42. ERI breached its warranty in material ways by failing to provide Hubbard with antennas that were free from defects and were fit for their intended purpose, including complying with the requirements of the ANSI/TIA-222-G Standard, as warranted. These defects in the antennas caused them to fail, as described herein.

43. ERI has also breached its promises by failing and refusing to redesign or replace without charge the defective antennas, despite the fact that the defects were not the result of ERI exclusions.

44. In so doing, ERI has deprived Hubbard of the benefit of the bargain it struck when it accepted the Proposals in the first instance.

45. As a direct and proximate result of ERI's material breaches, Hubbard has suffered substantial injury, including by paying ERI for antennas and related services that did not meet applicable standards, were not free from defects, and were not redesigned or replaced, as required.

46. By virtue of the foregoing, Hubbard is entitled to recover monetary damages determined in accordance with the contract, and/or to an order that the ERI antenna system is defective and requiring ERI to redesign and replace the antennas without charge to make them operational for broadcasting television signals.

## COUNT II

## CONVERSION

47. Hubbard incorporates by reference paragraphs 1 through 37 of this Complaint and further alleges as follows.

48. Hubbard owns and has the right to possess the antennas it purchased from ERI free from defects and able to broadcast television signals.

49. ERI knowingly and intentionally interfered with and exerted unauthorized control over Hubbard's antennas. Specifically, ERI took possession of, exercised dominion and control over, and refused to return in an operable, non-defective condition Hubbard's antennas. ERI intentionally demanded that, before Hubbard could receive its operable, non-defective property back, it must first comply with ERI's demands, by paying ERI a ransom in the form of a sum to fund an expensive and gratuitous "analysis" of the North Tower which has stood for decades without incident, and make changes to the North Tower that ERI deems necessary. These demands will dramatically increase, without justification, the cost of the antennas to Hubbard.

50. ERI's intentional interference and unauthorized control deprived Hubbard of possession, use, and value of the antennas in question, and caused Hubbard to suffer pecuniary loss.

51. By virtue of the foregoing, Hubbard is entitled to recover compensatory damages and all other damages authorized by Ind. Code § 34-24-3-1, including treble damages, attorneys' fees, and costs.

### JURY DEMAND

52. Hubbard demands trial by jury in this action of all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Hubbard respectfully requests an award in its favor granting the following relief:

    a. An award of monetary damages as requested herein;

    b. An award of specific performance as requested herein;

    c.    An award of treble damages, attorney's fees, and costs as requested herein;

    d.    Prejudgment and post-judgment interest; and

    e.    An award of any other relief deemed just and proper.

Respectfully submitted,

/s/ *Adam Arceneaux*
Adam Arceneaux, Atty. No. 17219-49
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282
T: 317-236-2137
F: 317-592-4604
adam.arceneaux@icemiller.com

Thomas L. Hamlin (Minn. Bar. #40216)
William Bornstein (Minn. Bar. #0392098)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T:  612-349-8500
F:  612-339-4181
thamlin@robinskaplan.com
wbornstein@robinskaplan.com
*(Pro Hac Vice Admission Pending)*

**ATTORNEYS FOR PLAINTIFFS**